```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                :
                                           Docket #17cr595
UNITED STATES OF AMERICA,              :

                    Plaintiff,         :

          - against -                  :

NICOLAS DE-MEYER,                      :
                                           New York, New York
                    Defendant.         :  February 27, 2018

------------------------------------ :


                      PROCEEDINGS BEFORE
              THE HONORABLE GABRIEL GORENSTEIN,
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:            U.S. ATTORNEY'S OFFICE
                          SOUTHERN DISTRICT OF NEW YORK
                          BY:  JUSTIN RODRIGUEZ, ESQ.
                          One Saint Andrew's Plaza
                          New York, New York 10007


For Defendant:            FEDERAL DEFENDERS OF NEW YORK
                          BY:  SABRINA SHROFF, ESQ.
                               SARAH NUDELMAN, ESQ.
                          52 Duane Street, Tenth Floor
                          New York, New York 10007
```

```
Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007
```

```
Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**<u>INDEX</u>**

**<u>E X A M I N A T I O N S</u>**

| <u>Witness</u> | <u>Court</u> | <u>Direct</u> | <u>Cross</u> | **Re-**<br><u>**Direct**</u> | **Re-**<br><u>**Cross**</u> |
|---|---|---|---|---|---|
| Jane Rettig | | | | | |

**<u>E X H I B I T S</u>**

| **Exhibit**<br>**<u>Number</u>** | **<u>Description</u>** | <u>ID</u> | <u>In</u> | **Voir**<br>**<u>Dire</u>** |
|---|---|---|---|---|
| None | | | | |

1

```
1                          PROCEEDING                        3

2              THE CLERK:   United States versus Nicolas De-

3    Meyer.  Counsel, please state your name for the record.

4              MR. JUSTIN RODRIGUEZ:   Good afternoon, Your

5    Honor, Justin Rodriguez for the United States.

6              MS. SABRINA SHROFF:   Good afternoon, Your Honor,

7    on behalf of Mr. De-Meyer, who's standing to my right,

8    Federal Defenders of New York by Sabrina Shroff and Sarah

9    Nudelman.  Good afternoon, Your Honor, I just wanted the

10   Court to know that I have present in Court today Mr. De-

11   Meyer's mother and his sister, both of whom are here from

12   Ohio where they live in support of their family member's

13   bail application.  Thank you.

14             THE COURT:   I guess this is a bail hearing.  I

15   should hear from you first or not?  What's the procedural

16   status?

17             MS. SHROFF:   Well, Your Honor, I think this is a

18   Rule 5(c)(3) here, so on bail --

19             THE COURT:   There was a determination in

20   California.

21             MS. SHROFF:   Right.

22             THE COURT:   I think you're moving to modify that

23   in some way.  It seems to me that's what's going on.

24             MS. SHROFF:   That's correct, I'm moving to modify

25   that.  It was referred to you by Judge Gardephe.
```

```
 1                        PROCEEDING                    4

 2            THE COURT:   So it's your application.

 3            MS. SHROFF:   Okay.  I'm happy to proceed in the

 4    first instance, Your Honor.  I am sure that the Court

 5    received and reviewed the bail transcript of the application

 6    made before the district judge in California.

 7            THE COURT:   Yes.

 8            MS. SHROFF:   And I sent that to the Court.

 9    Frankly, I was surprised that the Government had not

10    forwarded it to you, but I forwarded it to the Court so that

11    the Court was fully aware of all the arguments made before

12    the judge in California that there were no surprises to this

13    Court in its review.  And, most importantly, Your Honor, we

14    are not here to be reargue the factual arguments made by the

15    Government.  So say Mr. Rodriguez wants to stand up and say

16    that Mr. De-Meyer fled, that Mr. De-Meyer knew he was going

17    to be arrested, that Mr. De-Meyer was aware that he was

18    going to be arrested and, therefore, he took off, okay, for

19    purposes of bail we don't need to have an argument about

20    those facts.  Let's just say they're completely correct

21    about all of that.

22            What I'm trying to focus Court on, or rather, more

23    appropriately, focus my argument on is even with those facts

24    still in play, even if the Court credits them completely,

25    the Court also has to credit a set of other facts that
```

1

2  warrant release.  And I start where every bail application

3  should really start, which is the Bail Reform Act, because

4  that's the law, and the law here is there's a presumption of

5  release for Mr. De-Meyer because this is not a case that

6  carries a mandatory minimum sentence at all.  In fact, the

7  guideline range would be zero to whatever the statutory max

8  is.  If the Government wants to argue that or if the

9  Government wants to argue that the loss amount would be the

10 cost of these extremely expensive wines, whatever argument

11 they want to throw, that's fine, but the Court is still to

12 consider this to be a case where the presumption is in favor

13 of release.

14         So let's talk about all the factors that go into

15 the release column.  Mr. De-Meyer is a United States

16 citizen.  He was born and raised here.  Mr. De-Meyer

17 traveled.  When he traveled, even if the Government wants to

18 call that travel a flee, and I'm going outstanding address

19 the flee aspect of it in a moment, but when he left, he left

20 on his own passport.  He traveled on his own passport.  He

21 did not travel on any fake papers.  And he traveled openly.

22         So I was kind of surprised when I read the

23 California transcript that the Government relied so heavily

24 on all these different countries that Mr. De-Meyer went to

25 which shocked me quietly simply because at any point they

1

2   could've put a flag on him, put up a request for a warrant,

3   put up an Interpol warning, arrested him, and brought him

4   here.  They seemed to have done no such thing, and I'm kind

5   of confused as to why.  But putting that aside again, all of

6   his travel was transparent and open and clear.

7           All the other things that we have that are in

8   favor of a release package here.  We have family that is

9   present in court today.  We have his mother and his sister,

10  neither of whom live in New York, and I want to make that

11  clear.  Even though the case originates in New York, neither

12  of the two of them live here.  The bail package that we

13  propose would be a significant bail package, but it would be

14  cosigned by his mom and his mom would put up her home or put

15  up some collateral that the Court could put into place to

16  ensure that Mr. De-Meyer's aware of the very severe

17  consequences that would come to not just him but his elderly

18  mother who has no other person who would support her to get

19  back the amount of money she has in her home or the amount

20  of money she would put up in her bond.

21          Look, if the Court really thinks that none of my

22  arguments make any sense, I think that his mother would go

23  so far as to relocate to New York so that her son is

24  released, but I really ask the Court not to take such a far

25  out step because I do think the other conditions would

1

2    reasonably assure that Mr. De-Meyer comes to court.

3         Now, assuming that the Government will argue in

4    the do not release him column, that there's simply no way to

5    trust Mr. De-Meyer to come back to court because he fled.

6    Now, I don't even think the Government can take any argument

7    with the following facts.  At the time that he left the

8    United States to go to Rome, he was not in custody

9    obviously, he was not under arrest obviously, and there was

10   no warrant out for his arrest.  What the Government has

11   argued before, and I'm assuming that Mr. Rodriguez will

12   argue here again, is that he left knowing that his boss had

13   called the FBI, his boss's then separated wife had called

14   the FBI, and, two, that because he used a fake name on the

15   internet to, quote/unquote, as they put it, "sell the wine

16   bottles that he stole," that is his other identity and,

17   therefore, he cannot be trusted.

18        So I want to make sure that I address both issues.

19   Technically, there's nothing stopping him from leaving and

20   going wherever he wanted to go.  Does it give you as a Court

21   comfort that he left?  No.  Had he not left I would ask you

22   to release him on his recognizance, but he did leave.  He

23   left while there was no arrest warrant pending, no FBI agent

24   had contacted him, and nobody had told him do not leave this

25   country, state, or city.  Okay?

```
1                        PROCEEDING                    8
```

2          So what we're really guarding against, right, is

3    the precipitous step he took, perhaps from anxiety, perhaps

4    from fear, who knows what, or perhaps just callousness, we

5    don't need to get into the motives of it because we have the

6    step.  To assure that he now realizes the consequence of

7    that step and he will never ever take that kind of a step

8    again because it will cost not just him but also his family,

9    we've given the Court a very stringent package.  The package

10   would be that he be released on a bond.  We don't really

11   care about the amount, but, you know, go ahead, $200,000

12   personal recognizance bond, secured by his mother's home or

13   cash or whatever collateral that the Court would like to

14   come up with.  I think his mother could put up at least

15   $50,000 to $100,000 either cash or property.

16          He would be subject to home detention and

17   electronic monitoring.  I don't know if I'm getting the

18   phraseology correctly, if it's home incarceration or home

19   detention.  So he would leave the house only in the first

20   instance for doctor, church, and his lawyer is too far away

21   for him to visit us, so those would be the two things.  And

22   then depending on how Pretrial views his compliance, maybe

23   that will come out, and go find work and then return.

24   That's a very significant and stringent bail package that

25   I'm asking the Court to consider so that he may be released.

1
2          And if the Court has any questions, that is my
3   presentation on behalf of Mr. De-Meyer, but I cannot
4   emphasize enough that even if the Government is correct and
5   he left, there was nothing stopping him from leaving.
6   People flee all the time if that's the Government's
7   argument, right, you see a cop coming, you take off and you
8   run.  It's no different.  The fact that you ran does not in
9   and of itself say anything.
10          And, again, all of his travel was on his own
11  passport – oh, the passport has since expired.  I think you
12  read that in the California papers.  The passport was – I
13  fail to understand these agents at all.  They returned the
14  passport for some reason to his mother in Ohio, and it's
15  still in his mother's house in Ohio, and I'm more than happy
16  to surrender that.
17          He had no other fake identifications on his at
18  all.  To the extent that he had any visa to go anywhere,
19  it's with his travel document which has now expired.
20  Obviously, we would agree that he would not apply for any
21  other travel documents or anything else.
22          And, finally, if it's at all relevant to the
23  Court's analysis, of course I can stand here and recite a
24  litany of cases where the loss amount is far greater than
25  the loss amount here where people have been released on

1                           PROCEEDING                    10

2   bail.  The most significant case that I can give to the

3   Court, of course, are three – do you want me to go into

4   that?  Because some judges are not moved by that argument

5   because bail is an individualized risk assessment.  But --

6            THE COURT:   I'm happy to hear anything you want,

7   but from my point of view, I don't think the Government

8   would have objected to bail had there been not these other

9   things.  So unless these cases involve a person fleeing or

10  leaving when they're at a time of arrest, then the fact that

11  someone who stole a million dollars was let out on bail

12  hardly surprises me.

13           MS. SHROFF:   But he wasn't at a time of arrest.

14  That's all I'm saying.

15           THE COURT:   I'm sorry, at the time that he knew

16  there was an investigation.

17           MS. SHROFF:   Right.

18           THE COURT:   That's the big fact here.

19           MS. SHROFF:   I understand that.  It is at a time

20  of investigation, and I understand that, but it isn't at a

21  time of arrest.  I also wanted to speak to two other points,

22  right?  This proffer that they have of this woman recording

23  a phone conversation that Mr. De-Meyer has with her,

24  according to the Government he says to her, yes, yes, you

25  know, I was going to pay you back.  I stole your wine.  And

1
2  she tries to trick him into saying that he had stolen more

3  than seven or seven or whatever it is, that she actually

4  records this conversation without his permission.

5          To put that into context, his mother, who's seated

6  here today and I'm happy to call her as a witness, I don't

7  care, approached Mr. Solomon who's the Goldman Sachs

8  employer, so to speak, he works for Goldman Sachs, my client

9  didn't.  He just worked for Mr. Solomon.  Offered to make

10  restitution for her son, and his response was – what was it,

11  don't worry about it, I'm not going to lose a lunch?

12          MOTHER OF DEFENDANT:   I'm not going to give up

13  eating.

14          MS. SHROFF:   I'm not going to give up eating.  So

15  it's not a case where somebody is trying to hide from the

16  crime.  I just want to – there's no fugitive aspect to this

17  one is what I'm trying to tell the Court.

18          I do want to talk about – there's a case of United

19  States v. Dreyer in which, you know, there was some

20  allegation that Mr. Dreyer had taken off for a trip to

21  Turkey or was stopped right before he was going to take off

22  on a trip to Turkey.  The motivation is the same except that

23  Mr. Dreyer knew, and the FBI had been following Mr. Dreyer,

24  so they knew that he was lying about the trip to Turkey and

25  stopped him.  So I don't have a case that's like where

1                              PROCEEDING                        12

2    somebody actually takes off and then comes back.  And, by

3    the way, he does come back.  It's not the agent who go find

4    him.

5            THE COURT:   That's - in light of the facts,

6    that's your strongest counter I suppose, and I don't know

7    that we have an explanation for it, but the fact that he

8    came back is obviously highly significant.

9            MS. SHROFF:   He came back, he contacted his

10   mother, he said he was going to come back.  He was going to

11   come back and deal with whatever came his way.  I understand

12   that his mother contacted a lawyer in Ohio and was hoping

13   that the lawyer in Ohio would be able to either safeguard

14   his way in or try and resolve the matter, but he was

15   arrested at the airport.

16           THE COURT:   Okay.

17           MS. SHROFF:   Oh, and obviously it's clear in the

18   presentence report here that Mr. De-Meyer has no prior

19   criminal history or I would be able to cite to his lack of

20   bench warrants or any such thing, but he has no prior

21   criminal history.

22           Finally, Your Honor, I want to note that

23   California recommended conditions of release.  Did you want

24   the conditions or do you have them?

25           THE COURT:   I noticed it was missing from the

1                              PROCEEDING                        13

2      report that was provided to me.

3              MS. SHROFF:   So I'm going to hand it up to the

4      Court.

5              THE COURT:   Is that their policy or something?

6      Oh, it's this document here, I have it.  Never mind.  All

7      right, I have it, thank you.

8              MS. SHROFF:   Okay, so to the extent that the

9      flight is such that it would concern you, the presumption

10     cures that concern because the presumption is for release,

11     and the standard is to reasonably assure that a person will

12     come back to court.  Thank you, Your Honor.

13             THE COURT:   Okay, thank you.

14             MR. RODRIGUEZ:   Your Honor, the question today is

15     whether there are a set of conditions that can reasonably

16     assure the Court of the defendant's future appearance in

17     court.  For the following reasons there are not, as the

18     court in California found.

19             First, the defendant spent 14 months traveling

20     abroad once it was clear to him that he was going to get

21     caught.  And I completely agree with defense counsel that

22     when he left, he was free to do so.  He was not indicted

23     until September of 2017, at which time an arrest warrant was

24     issued.  But the facts of his departure should cause great

25     concern to the Court about whether there are a set of

1

2   conditions that can be imposed here.

3          Number two, while he was traveling, he had at his

4   disposal, and used, a significant amount of money, and

5   that's not surprising because he made a significant amount

6   of money stealing and selling the wine at issue here.

7   Number three, he used other people, specifically his mother,

8   to help him get access to those funds while he was

9   traveling.  And, finally, he has shown a comfort with and an

10  ability to use an alias.  He didn't travel with an alias,

11  but he has used an alias in this case.

12          THE COURT:   To commit the crime.

13          MR. RODRIGUEZ:   To commit the crime, correct.

14          THE COURT:   I mean you'd be crazy not to, right?

15          MR. RODRIGUEZ:   So as I mentioned --

16          THE COURT:   The alleged crime I should say.  Go

17  ahead.

18          MR. RODRIGUEZ:   As I mentioned, the indictment

19  was returned in September of 2017.  The defendant was

20  arrested on January 16 at LAX when he arrived on a flight

21  from Rome.  Why he came back I don't know.  Maybe he thought

22  the Government gave up looking for him.  There's nothing –

23  no information that the Government has in that regard.

24          As to the conduct at issue here, from 2008 to 2016

25  he worked as a personal assistant to someone who collects

rare and expensive wine.  That employment is not reflected

in the California Pretrial Services report; I don't know

why.  He stole, as set forth in the indictment, hundreds of

bottles of wine worth more than a million dollars, and as I

just mentioned, he used an alias to sell that wine, to sell

it to a North Carolina based wine dealer.

Once the defendant realized that it was only a

short matter of time before he would get caught, he fled the

country, and let me tell you about that, how did he come to

realize that he would get caught.  So in October of 2016 a

Napa Valley wine dealer purchased seven bottles of

particularly rare Domaine de la Romanée-Conti wine through

Wine Liquidators, the dealer that the defendant was selling

the victim's wine to.  The Napa Valley dealer was able to

determine, based on the label, because the wine is so rare,

essentially who had imported and distributed the wine, and

he was able to trace that back to the victim, and he

suspected that it might be stolen.  He contacted the

victim's wine broker, and he confirmed that they were, in

fact, stolen.

So then police in Easthampton, New York, which is

where the victim has a large wine cellar, began

investigating.  On November 7 of 2016, a detective at the

Easthampton Police Department met with the defendant who at

PROCEEDING                    16

that time was not a suspect, but he had asked the defendant

to allow him access to the victim's wine cellar for purposes

of the investigation.  At that time the detective made some

sort of offhand comment to the defendant about how easy it

was going to be to solve this crime because all they had to

do was trace back where the wine came from.  Well, that must

have really caused the defendant to panic.  That was on

November 7.

        The next day, November 8, and this is according to

a sworn statement from the victim's wife, the defendant

called the victim's wife and he said he was very upset, he

needed to talk to her.  So the victim, the victim's wife,

and the defendant all met up at the Greenwich Hotel.  So

there the defendant confessed to stealing from the victim

the seven bottles of wine that I mentioned earlier.  He said

that he had sold the wine to a wine dealer called Wine

Liquidators which he found online.  The parties all agreed

that they would meet up the next morning, which would've

been November 9, but the defendant never showed up.

        Historical cell site data on the defendant's

phone, and that's the same phone number he provided to

Pretrial Services in California, shows him pinging off cell

towers near the Greenwich Hotel at about 9:15 p.m. on the

night he met with the victim and his wife.  An hour and a

1                              PROCEEDING                    17

2    half later his phone is pinging off cell towers at JFK.

3    According to travel information, he was on an Alitalia

4    flight from JFK to Rome that night, November 8, the night of

5    the meeting, scheduled to depart at 10:25 p.m.  According to

6    his Amex records, the defendant uses American Express to buy

7    the ticket that day for $5,300.  Cost was not a concern.

8    Getting out of the country was a concern.  The next day,

9    November 9, he's withdrawing money from his First Republic

10   bank account at an ATM at an airport in Rome.

11           So the circumstances of the defendant's departure

12   leave no question that he wanted out of there.  He was free

13   to leave, but he did not want to go to jail.  And he

14   confirmed that in a call to the victim's wife a few days

15   later.  November 17, the defendant calls the victim's wife

16   who had the presence of mind to put it on speakerphone and

17   video record it.

18           During that call, he, again, confessed to stealing

19   the seven bottles of wine.  He said he was scared he was

20   going to be arrested after meeting with the victim's wife

21   the week before, so he left for his, quote/unquote, "home"

22   in Italy.  What that home is is unclear.  He added that he

23   left because the victim couldn't promise that he wouldn't be

24   prosecuted or go to prison and that the FBI was involved.

25   He said he was scared, and he couldn't go to prison, that's

1                           PROCEEDING                        18

2   why he left.  He acknowledged that he had every intention of

3   leaving when he met up with the victim that night.

4           His bank records confirm extensive travel that had

5   to have been financed by a significant amount of money.  So

6   from November of 2016 to January of 2017, he's in Rome and

7   Capri.  In January of 2017, Casablanca, Marrakesh.  January

8   and February of 2017, Rome.  February and March, Rio

9   Ipanema.  March and April, Buenos Aires, back to Rio.  April

10  to September, Rome, Marrakesh, Capri, Italy, bouncing back

11  and forth.  A Brazilian visa, more travel to Marrakesh in

12  October, travel to Zurich, travel to Rome.

13          So this raises another issue that I think is very

14  relevant to the Court's consideration which is where did he

15  get all this money to travel?

16          Well, after the seven bottles of wine that I

17  mentioned earlier were found stolen, it was discovered that

18  the defendant had actually been stealing and selling the

19  victim's wine for years.  He'd stolen over 500 bottles of

20  wine worth more than $1.2 million.  The Government's

21  investigation to date, including its interviews with

22  witnesses, suggests that most of these transactions were

23  done in cash and that the defendant retained more than a

24  million dollars for his sales of stolen wine.  Much of that

25  cash is still unaccounted for and may still be available to

1                          PROCEEDING                    19

2    the defendant if he's released.

3           Based on a preliminary review of his First

4    Republic Bank records, we've seen over $40,000 in checks

5    from Wine Liquidators from May '14 to December '15, as well

6    as over $57,000 in cash deposits from May '14 to July of

7    2014.  A J.P. Morgan bank account in the defendant's

8    partner's name has shown checks and wire transfers from Wine

9    Liquidators of at least $153,000 from May of 2014 to March

10   of 2016.

11          THE COURT:  I'm sorry, say that again.  What

12   happened with a partner?

13          MR. RODRIGUEZ:  A JPM account in the defendant's

14   partner's name, and this was an account separately that

15   email evidence suggests he provided to Wine Liquidators --

16          THE COURT:  He being?

17          MR. RODRIGUEZ:  The defendant.

18          THE COURT:  Yes.

19          MR. RODRIGUEZ:  He gave this account information

20   to Wine Liquidators and said send money here and there's

21   email evidence of that.

22          THE COURT:  Okay.

23          MR. RODRIGUEZ:  That account shows checks and

24   wire transfers from Wine Liquidators of at least $153,000

25   from May of 2014 to March of 2016.  That's just the money

```
 1                          PROCEEDING                        20
 2  that's been accounted for so far.
 3              THE COURT:   How about the money into accounts
 4  controlled by him, what's the total?
 5              MR. RODRIGUEZ:   So there's the First Republic
 6  bank account that I mentioned, and so far we've seen from
 7  May of 2014 to December of 2015 over $40,000 in checks from
 8  Wine Liquidators.
 9              THE COURT:   Forty thousand in that same, the May
10  2014 to May 2016?
11              MR. RODRIGUEZ:   May 2014 to December of 2015 --
12              THE COURT:   December 2015 is $40,000 to
13  defendant's First Republic account.
14              MR. RODRIGUEZ:   Correct.  From May 2014 to July
15  2014, over $57,000 in cash deposits to the defendant's First
16  Republic bank account.
17              THE COURT:   I'm sorry, I thought you said 40.
18  Was that a different time period?
19              MR. RODRIGUEZ:   Forty is the checks --
20              THE COURT:   Checks and 57 cash.
21              MR. RODRIGUEZ:   Is cash.
22              THE COURT:   Got it, sorry.
23              MR. RODRIGUEZ:   And the JPM account is 153,000 in
24  checks.
25              THE COURT:   That's the defendant's partner's
```

PROCEEDING                                    21

account.

        MR. RODRIGUEZ:   That's correct, Your Honor.

        THE COURT:   And that's checks.

        MR. RODRIGUEZ:   Checks and wires.

        THE COURT:   Okay, do you know of any other accounts?

        MR. RODRIGUEZ:   No, Your Honor.

        MS. SHROFF:   Your Honor, is there a dollar amount as of 2016 or 2017?  Because we're now in 2018.

        THE COURT:   Hold on, can I just – let's – I'll give you a chance when we're done.  So do you have indication – and maybe you're getting to this – but are these accounts used for withdrawals when he's abroad?

        MR. RODRIGUEZ:   Yes, the First Republic account is used for withdrawals when he's abroad, and the list of countries --

        THE COURT:   And how much was it when he left and how much was it when he came back?

        MR. RODRIGUEZ:   I don't have those figures available, Your Honor.  But, again, we're talking --

        THE COURT:   Is that account, I mean I assume it's some negligible amount or you'd be coming in with a seizure warrant or something.

        MR. RODRIGUEZ:   Correct.

PROCEEDING                          22

1

2          THE COURT:  At this point it's a negligible

3   amount.

4          MR. RODRIGUEZ:  At this point I believe --

5          THE COURT:  And how about the partner's account,

6   do you know where that is now?

7          MR. RODRIGUEZ:  Right now, similarly, I think it

8   fluctuates quite a bit, but we're not, it's not a

9   significant amount.

10          THE COURT:  It's not a significant amount.

11          MR. RODRIGUEZ:  In fact, review thus far suggests

12   that there's a large amount of money, and, again, we're

13   talking about these were mostly cash transactions, that did

14   not find its way into these accounts.  So where is it?  That

15   raises the question.

16          THE COURT:  Miss Shroff, I'm thinking about

17   taking a break, and I'll tell you why.  The defendant's

18   family seems to have left the courtroom --

19          MS. SHROFF:  I think they had a flight issue

20   because - that's the only reasons --

21          THE COURT:  Oh, they may be leaving?

22          MS. SHROFF:  Yeah.  I told her to go get them and

23   we'll pay for a later flight.  I had a - I was supposed to

24   do this earlier today, as the Court knows, and I had another

25   case, I had an emergency, so I had to push it back, and I

PROCEEDING                          23

1

2  thought my office had taken care of the flight.  Their

3  flight change.  So I just want to make sure --

4          THE COURT:   Okay, let's take a little break.

5          MS. SHROFF:   Okay.  But I do want to address the

6  issue of the account --

7          THE COURT:   No, no, let's take a break.

8          MS. SHROFF:   Okay.  No, no, when we come back I

9  meant.

10          THE COURT:   You can do whatever you want when we

11  come back.

12          MS. SHROFF:   Okay.  All right, let me go --

13          (off/on the record)

14          THE COURT:   I interrupted you.

15          MR. RODRIGUEZ:   Thank you, Your Honor.  There's

16  just one final point that I wanted to make, and that's that

17  during the defendant's travel he has used his family to help

18  finance his travel, and I think that should give the Court

19  some concern that he may do so in the future.

20          The bank records that I was referring to earlier

21  with respect to the defendant's First Republic bank account

22  show that on November 2 he sent 17,000 --

23          THE COURT:   November 2 of?

24          MR. RODRIGUEZ:   Of 2016, I apologize, $17,500 to

25  his mother from his First Republic account.  The next day,

```
 1                        PROCEEDING                    24

 2   November 3 --

 3           THE COURT:  I'm sorry, what day did he leave the

 4   country?

 5           MR. RODRIGUEZ:   November 8.

 6           THE COURT:  So this was six days before he left.

 7           MR. RODRIGUEZ:  Correct.  On November 3 --

 8           THE COURT:  Hold on, so November 2 he transferred

 9   to the mother how much?

10           MR. RODRIGUEZ:  Seventeen thousand five hundred

11   dollars.

12           THE COURT:  Okay.  Go ahead.

13           MR. RODRIGUEZ:  The next day, November 3, 2016,

14   again, he sent $17,500.

15           THE COURT:  To the mother.

16           MR. RODRIGUEZ:  Correct, from his First Republic

17   bank account.

18           THE COURT:  Okay.

19           MR. RODRIGUEZ:  And then over the course of his

20   travel, we see numerous transfers of money and deposits from

21   his mother into his First Republic account while he's

22   traveling.

23           THE COURT:  From the mother's account.

24           MR. RODRIGUEZ:  Correct, well, it would be, it's

25   a combination of wire transfers from his mother's account as
```

PROCEEDING                    25

well as deposits that his mother made directly into his

First Republic account.

        THE COURT:   Hold on.  Deposits other than a wire

transfer, is that what you mean, in cash?  What do you mean?

I'm sorry.

        MR. RODRIGUEZ:   Cash as well as money orders, and

I'll get into the specifics of those as well.

        THE COURT:   All right, let me just get this

straight.  So after he leaves the country, there's money

being deposited back into the First Republic account from

the mother, is that what you're saying?

        MR. RODRIGUEZ:   That's correct.

        THE COURT:   Okay, cash and money orders and wire

transfers.

        MR. RODRIGUEZ:   Correct.

        THE COURT:   Okay, go ahead.

        MR. RODRIGUEZ:   So to give you some specifics on

that, February 13 of 2017, his mother sends a wire transfer

of $9,000 to his First Republic bank account.  March 23,

2017, his mother sends another wire transfer, $3,000, to the

defendant's bank account.  April 25, 2017, she deposits

$3,000 in cash.  July 3, 2017, she deposits $9,000 in money

orders, and it's clear from the face of the money orders

that these were money orders purchased at a Kroger's in

1          PROCEEDING                    26

2  Findlay, Ohio which is where she lives.  August 9, 2017,

3  $9,600 the mother deposits into the account, again, includes

4  more money orders purchased at a Kroger's in Findlay, Ohio.

5  September 11, 2017, she sends another $5,500 to the

6  defendant.  He's used family members to finance his flight

7  before.  There's a suggestion that he could do the same

8  again.

9          So with that, unless the Court has any further

10  questions, we'll leave it there for now.

11          THE COURT:   Do you have the mother's bank account

12  records?

13          MR. RODRIGUEZ:   No, Your Honor.

14          THE COURT:   Do you know the total that the mother

15  put into his account?

16          MR. RODRIGUEZ:   Thirty-nine thousand dollars.

17          MS. SHROFF:   Seventeen and 17, so how much for

18  you?

19          MR. RODRIGUEZ:   Seventeen plus 17 is, again,

20  remember, the defendant going out to his mother.

21          MS. SHROFF:   Which is 39 --

22          (interposing)

23          THE COURT:   Miss Shroff, you're not helping the

24  situation.  Please, I'm begging you.  I'll give you a chance

25  when I'm done.  And how about from the partner, is there

1                              PROCEEDING                      27

2   money coming from that account into the defendant's – I'm

3   sorry, is there money coming – yes, you have the partner's

4   bank records, right?

5            MR. RODRIGUEZ:   That's correct, Your Honor.

6            THE COURT:   Is there money going to the defendant

7   from that account during this period or you can't tell?

8            MR. RODRIGUEZ:   Not that we can tell.

9            THE COURT:   But it got depleted.

10           MR. RODRIGUEZ:   Correct --

11           THE COURT:   The partner's account is some

12  negligible number now.

13           MR. RODRIGUEZ:   It seems like it is still in use

14  by his partner, money goes in, going out, but based on what

15  we can see --

16           THE COURT:   It's under 10,000 or it's in that

17  range or --

18           MR. RODRIGUEZ:   Yes, Your Honor.

19           THE COURT:   Okay.   All right, thank you.   Miss

20  Shroff.

21           MS. SHROFF:   So let me see if I can just deal

22  with the math because 17 plus 17,000 is about 34,000, right?

23           THE COURT:   It's two 17,500's, which is exactly

24  35,000.

25           MS. SHROFF:   Right, and he gives his mother,

according to them, he gets back from her 37, approximately

37, right?

THE COURT:   I think they said 39, but okay.

MS. SHROFF:   So 35 to 39, so basically he gives

his money, right, and if you go back to the call and you go

back to the mother's statement that, I'm happy to call her

as a witness and say under oath, that her first step after

Mr. De-Meyer leaves the country, not flees, because, again,

they keep using this word flee.  There's nothing wrong with

him leaving.  Just want to make sure about this, so there

should be the use of the word flee.

His mother goes to Mr. Solomon and says I am

willing to --

THE COURT:   I'm sorry, Solomon?

MS. SHROFF:   Mr. Solomon is the boss.  His boss.

THE COURT:   Oh, I'm sorry, the victim.

MS. SHROFF:   Right.  So he goes back to the

multi-million dollar victim and says I'm willing to try and

start paying you back.  He said don't worry about it, it's

not like I'm going to starve or not have lunch.  That is how

she gets the 17 plus 17 from her son.  The boss doesn't want

the money.  As her son needs money for expenditure that he

undertakes in his very own name, again, no alias, she gives

the money back to him because he's having trouble finding

1

2    work.  His degree is in art history.  He goes from place to

3    place trying to find work.  Rome is a logical place for him

4    to go to find work because that's where he had worked before

5    and gone to school.  He goes to other places where he has

6    friends who will allow him or help him find temporary jobs

7    which he undertakes, and he pays for the travel.

8            The travel in and of itself is not of a monumental

9    nature.  It is not a huge amount because, as you see from

10   the tally that Mr. Rodriguez has given you, he sustains

11   himself on exactly or close to the amount of money he from

12   his own bank account has given to his mother.  The money

13   that the money was going to use to start and defray the cost

14   of the multi-million dollar wine that Mr. Solomon lost.

15           Okay?  So there's nothing nefarious about buying a

16   money order from a Kroger's in Findlay, Ohio.  In fact, it

17   defeats their argument that Mr. De-Meyer is living under an

18   alias or a pseudonym or living in a way that is not

19   transparent to law enforcement.  The whole time that he is

20   traveling, he's traveling under his own name.  So I'm not

21   really clear why the FBI doesn't go arrest him.  It just

22   seems to be kind of an odd situation to me.

23           I would understand if they said he was a fugitive,

24   then I would agree perhaps the conditions could not be set,

25   but he's not a fugitive.  They don't put out a banner and

1

2    say, hey, buddy, you're indicted.  They don't unseal an

3    indictment and say come back, we're looking for you.  They

4    could've done any one of those things.  They did none.

5    Okay?  You have a person at best who panicked and took off,

6    and if the Judge – let's just take everything they're saying

7    about the call to the wife of Mr. Solomon, the multi-million

8    dollar victim, as true, I think he should get point of

9    super-acceptance of responsibility.  Right?  She's

10   entrapping him into a confession, and he's confessing.  I'm

11   not really --

12          THE COURT:  So let me just – since I think I've

13   heard, I think we're repeating some things, I want to ask

14   you some questions.

15          MS. SHROFF:  Okay.

16          THE COURT:  First, I notice you did not offer as

17   a financial responsible person to sign a bond either the

18   partner, the sister, or an individual who apparently

19   appeared in California who was supposedly making 100,000 a

20   year.  Is that something that was a matter of consideration

21   by you or not?

22          MS. SHROFF:  Let me answer the first question

23   because the partner I can answer most easily.  Mr. De-Meyer

24   and the partner are not together and haven't been for quite

25   some time.  So if the Government wants to argue somehow that

PROCEEDING                          31

1

2  there is some kind of ongoing relationship between the two

3  where the partner is sending money to Mr. De-Meyer, we'd be

4  happy to look at those records, but that relationship has

5  finished.  It's actually finished during the time years ago,

6  number one.

7            THE COURT:   Hold on one second before you go on.

8            MS. SHROFF:   Sure.

9            THE COURT:   How long ago did they break up?

10           MS. SHROFF:   A year ago April.

11           THE COURT:   The Pretrial Services report from

12  California uses the present tense, says his boyfriend

13  resides in New York.  What's that referring to?

14           MS. SHROFF:   That was then.

15           MR. DE-MEYER:   No, that was another boyfriend.

16           (pause in proceeding)

17           MS. SHROFF:   That's definitely not referring to

18  the boyfriend at issue in the case.  The boyfriend at issue

19  in the case has since returned to Brazil.  He doesn't live

20  here.

21           THE COURT:   I gather the current boyfriend is not

22  interested in signing a bond.

23           MS. SHROFF:   I don't think that is – they're not

24  together now.  They were together --

25           THE COURT:   You're not listening to me, Miss

1
2  Shroff.  There's two boyfriends.  There's one he broke up

3  with a year ago, and there's one that, as of last month, he

4  told California, and I thought you just told me, is a

5  current boyfriend, and all I asked was is that current

6  boyfriend been approached to be a surety?

7          MS. SHROFF:   No, Your Honor, we have not

8  approached him.

9          THE COURT:   Okay.

10          MS. SHROFF:   His father would sign.  I'm sorry, I

11  should've mentioned that.  His father would cosign the bond.

12  His parents are divorced, but his father would cosign the

13  bond.

14          THE COURT:   Okay, I had asked you about a number

15  of individuals.  You can either go through them or not.

16          MS. SHROFF:   Okay, so the boyfriend at the time

17  of the offense is out because he has moved to Brazil.  The

18  person in California is his nephew named – the family tells

19  me his name is Jordan, but I have not, I never thought of

20  him as a potential surety, so I didn't ask.

21          THE COURT:   I thought in the transcript he was

22  offered up.  Was I wrong?  Someone thought of him.

23          MS. SHROFF:   I think he offered while Mr. De-

24  Meyer was in California he could stay with him, and I'm sure

25  that still holds true, but I don't think Mr. De-Meyer is

1                                  PROCEEDING                    33

2   going to move to California now.

3              THE COURT:   I'm not asking you about moving.   I'm

4   asking about whether he was offered as a surety or not.   If

5   you want to take a break now.

6              (pause in proceeding)

7              MS. SHROFF:   Well, Your Honor, I'm just trying to

8   tell the Court that I did not ask him.

9              THE COURT:   I'd still like to know if he was

10  offered at the prior hearing, regardless of whether you

11  asked him.

12             MS. SHROFF:   It's on page 31, Your Honor, it

13  says, "Also present in court today is his nephew or cousin"

14  --

15             THE COURT:   A willing surety, I thought so.   So

16  that was made, that offer was made in California.   Go ahead.

17             MS. SHROFF:   No, Your Honor, it just says he's

18  employed, he has a sales job (indiscernible) owns and that

19  he lives locally, so Mr. De-Meyer --

20             THE COURT:   Can you read the previous sentence

21  please?

22             MS. SHROFF:   Oh, he's here to support but also

23  told me he's a willing suretor, okay.   So if he was willing

24  then, I'm sure he'd be willing now, but I haven't spoken to

25  him is all I'm saying.

1                            PROCEEDING                      34

2              THE COURT:   Okay, so I asked you about the sister

3    and whether --

4              MS. SHROFF:   The sister would sign – the sister

5    is married, Your Honor, and because there is a non-relative

6    involved, we are not able to give her as a cosigner, but she

7    would certainly sign for moral suasion.  But she's here for

8    the Court's questioning, and she says she would sign.  She's

9    nodding her head yes.

10             THE COURT:   Which is it, she'll sign – there's no

11   such thing as signing for moral suasion and not being

12   responsible.

13             MS. SHROFF:   She would sign the bond, Your Honor,

14   I just checked.

15             THE COURT:   Okay, the next issue, I don't know

16   that we're going to solve it tonight, and, again, I'm not

17   promising anything whatsoever, but the mother's financial

18   situation is extremely important for purposes of determining

19   her status as a surety.  I would be interested in having a

20   sworn testimony or statement from her as to actually how

21   much she has in resources, meaning cash.  I know I heard

22   about her home from the Pretrial Services report.  I know

23   that she owns that free and clear, and that's helpful.  So

24   I'm talking about all other assets of any kind, whether

25   cash, securities, or any other thing of value.  I don't know

PROCEEDING                              35

1

2    if you have the answer to that question, but that would be

3    of great interest to me.

4              (pause in proceeding)

5              MS. SHROFF:   Your Honor, would you like to hear

6    directly from her or would you like me to just tell the

7    Court?

8              THE COURT:   I need to hear from her either under

9    oath or, you know, in a written statement at a later date.

10             MS. SHROFF:   So we can just do it under oath now.

11             THE COURT:   Okay.  Hold on, Miss Shroff, I want

12   you to explain to her I'm going to ask if any of the money

13   she has now is money she received from the defendant.  So I

14   mean – let me put it another way.  I'm going to ask the

15   source of the money because the Pretrial Services report

16   says she makes 15,000 a year which is not normally

17   consistent with someone having $50,000 to $100,000 in assets

18   in case which is what I thought you told me.

19             MS. SHROFF:   She makes $15,000 a month.

20             THE COURT:   Oh, I misread it then.  Sorry.

21             MS. SHROFF:   That's okay.

22             THE COURT:   Okay, well, I'm going to ask about

23   the source of this money.

24             MS. SHROFF:   Okay.

25             THE COURT:   Okay, I did misread it.  All right,

```
 1                        PROCEEDING                    36

 2   so she wants to go ahead.

 3            MS. SHROFF:   Yes, please.

 4            THE COURT:   All right.

 5            MS. SHROFF:   All right.  Your Honor, should I

 6   just have her stand next to me?

 7            THE COURT:   She can either stand here or sit up

 8   here.  Ask her what she'd prefer.  Hold on, I'm going to ask

 9   the Clerk to swear you in.

10            JANE RETTIG, THE WITNESS, IS SWORN

11            THE CLERK:   Please state your name for the

12   record.

13            MS. JANE RETTIG (THE WITNESS):   Jane Rettig.

14            THE CLERK:   Spell your last name.

15            THE WITNESS:   R-E-T-T-I-G

16            THE COURT:   Would you rather sit down?  We can

17   pull a chair up.  That would be more comfortable.  The

18   Government will offer up a chair there so that you don't

19   have to stand.

20            THE WITNESS:   All right, thank you.

21            MS. SHROFF:   We're all good.

22   EXAMINATION BY THE COURT:

23            THE WITNESS:   I probably have, I would think,

24   around 50,000 in my --

25            THE COURT:   No, no, I'm going to ask you a whole
```

1
2      bunch of questions.

3              THE WITNESS:   Okay, okay.

4              THE COURT:   Your last name was, I'm sorry.

5              THE WITNESS:   Rettig, R-E-T-T-I-G.

6              THE COURT:   Where do you live, Miss Rettig?

7              THE WITNESS:   Findlay, Ohio.

8              THE COURT:   And you don't have to give me your

9      street address on the record.  I think it's here somewhere.

10     But the house you live in now, how long have you lived

11     there?

12             THE WITNESS:   Fourteen years.

13             THE COURT:   Did you buy it?

14             THE WITNESS:   I did.

15             THE COURT:   It's in your name?

16             THE WITNESS:   It's in my name.

17             THE COURT:   Does it have a mortgage?

18             THE WITNESS:   No, it's paid for.

19             THE COURT:   Did you ever have it appraised?

20             THE WITNESS:   No, I have a girlfriend that is a

21     realtor and she thinks I can sell it for around 225, 200 to

22     225.  200 would be low; 25 would be nice, 225.

23             THE COURT:   Do you own any other real estate,

24     homes, anything like that?

25             THE WITNESS:   I have storage units that I rent

```
 1                      RETTIG (by the Court )            38
 2  out to people, and I have two locations.  I believe there's
 3  about 256 units, I own them free and clear.
 4            THE COURT:   What's their value?
 5            THE WITNESS:   You know, I don't know.  A
 6  realtor's never told me.
 7            THE COURT:   Are they in your name?
 8            THE WITNESS:   They're in my name.
 9            THE COURT:   Or a corporate name?
10            THE WITNESS:   Yes.
11            THE COURT:   In your personal name?
12            THE WITNESS:   Well, let's see, they're in --
13            FEMALE VOICE:   You're the sole proprietor.
14            THE WITNESS:   I'm the sole proprietor.
15            THE COURT:   Hold on.  The storage units, are they
16  on property?
17            THE WITNESS:   Yes, they're on property.
18            THE COURT:   And do you own the property?
19            THE WITNESS:   Yes.
20            THE COURT:   It's in your name?
21            THE WITNESS:   Yes.
22            THE COURT:   Do you have a deed to that property?
23            THE WITNESS:   I do.
24            THE COURT:   And it's separate from your house.
25            THE WITNESS:   Separate from my house.
```

```
 1                    RETTIG (by the Court )            39

 2              THE COURT:   Two other properties other than your

 3   house?

 4              THE WITNESS:   I have my house, and then I have

 5   storage units at two different locations that I own free and

 6   clear.   There's 256 I think units.

 7              THE COURT:   Okay, when you say units, these are

 8   little structures on the property.

 9              THE WITNESS:   It's a building, and then the

10   building has several little units in it with doors --

11              THE COURT:   Okay, and there's – but the point is

12   you own the land and you have a deed to that and --

13              THE WITNESS:   Yes.

14              THE COURT:   -- built on the land are these

15   storage units.

16              THE WITNESS:   Yes.

17              THE COURT:   Okay, got it.

18              THE WITNESS:   And they're paid for.

19              THE COURT:   All right.

20              THE WITNESS:   And then I have money invested.

21              THE COURT:   Tell me about that.

22              THE WITNESS:   I believe --

23              THE COURT:   Actually, let me just finish.

24              THE WITNESS:   Okay.

25              THE COURT:   Do you own any other land or real
```

RETTIG (by the Court )                    40

1  property?

2           THE WITNESS:   No, just the condo and the two

3  locations of the storage units.

4           THE COURT:   Okay.  All right, do you have bank

5  accounts?

6           THE WITNESS:   Yes.

7           THE COURT:   Do you have more than one?

8           THE WITNESS:   I have a personal one that I put my

9  social security check in, and then I have the one that my,

10 is my business.

11          THE COURT:   Okay, and how much money is in your

12 personal account right now, guesstimated?

13          THE WITNESS:   Let's just say 15,000, not very

14 much.

15          THE COURT:   1-5 thousand.

16          THE WITNESS:   Fifteen, 15,000.

17          THE COURT:   Fifteen thousand.

18          THE WITNESS:   Yes.

19          THE COURT:   And you have a business account?

20          THE WITNESS:   I have a business account --

21          THE COURT:   And it's in whose name?

22          THE WITNESS:   It's, well, it's called Rettig-U-

23 Store, and it's Jane Rettig.

24          THE COURT:   And you're the sole proprietor?

```
 1                    RETTIG (by the Court )            41
 2            THE WITNESS:   Yes.
 3            THE COURT:   Is that incorporated or
 4  unincorporated?  Is there a certificate of incorporation or
 5  just a business name?  Or you're not sure?
 6            THE WITNESS:   I'm not sure to be honest.
 7            THE COURT:   How much money is in that account?
 8            THE WITNESS:   I'm going to say 45,000 to 55,000
 9  right now.
10            THE COURT:   And you have employees in your
11  business or not?
12            THE WITNESS:   Just me.
13            THE COURT:   Okay.
14            THE WITNESS:   And I have some money invested.
15            THE COURT:   Okay, but I haven't finished your
16  accounts.
17            THE WITNESS:   Okay, go ahead.
18            THE COURT:   So we have your personal account, we
19  have the business account.  What other accounts do you have?
20            THE WITNESS:   That I believe is it.
21            FEMALE VOICE:   And your investments.
22            THE WITNESS:   And my investments.
23            THE COURT:   Well, how is the money invested, I'm
24  sorry?
25            THE WITNESS:   Stocks, bonds --
```

```
 1                        RETTIG (by the Court )            42

 2            THE COURT:   Well, you have a brokerage account

 3   then?  How do you --

 4            THE WITNESS:   I'm with Thrivent, Thribrant.

 5            THE COURT:   Okay, so you have an account with

 6   Thrivent.

 7            THE WITNESS:   Uh huh.

 8            THE COURT:   And how much, you must get a

 9   statement that says what the value is of those stocks and so

10   forth.

11            THE WITNESS:   Right.

12            THE COURT:   Do you know approximately what it was

13   on your last statement?

14            THE WITNESS:   I'm thinking around 700,000.

15            THE COURT:   Seven hundred thousand.  Okay.  Do

16   you have any other assets?

17            THE WITNESS:   Car.

18            THE COURT:   What kind of car?

19            THE WITNESS:   2011 Mercedes.

20            THE COURT:   Got it.  And the money accumulated in

21   the Thrivent account, did that come from your business or

22   some other source?

23            THE WITNESS:   Business, my husband died and there

24   was an insurance policy, I put that in.  Just over several

25   years.
```

```
 1                      RETTIG (by the Court )              43

 2           MS. SHROFF:   When did you open the account?

 3           THE WITNESS:   I don't know.

 4           MS. SHROFF:   Twenty years ago, 20 years ago.

 5           THE WITNESS:   Maybe 20.

 6           (interposing)

 7           THE WITNESS:   Maybe I opened it 20 years ago, I

 8   really don't remember.

 9           THE COURT:   Okay, and is it mostly stock, bonds,

10   cash, what form is it?

11           THE WITNESS:   Mutual funds, stocks, Facebook

12   stock that's doing wonderful.  I have IRAs or an IRA.

13           THE COURT:   Okay.  All right, I think that's it

14   for my questions.  Miss Shroff, I'm going to give you a

15   chance to ask some questions, and then the Government.  Do

16   you have any questions?

17   EXAMINATION BY MS. SHROFF:

18      Q:   I think the only question I would ask is other

19   than the dollar amounts that the prosecutor said were put

20   into your account by your son, did you ever receive any

21   other money from him?

22      A:   No.

23      Q:   Just answer that.

24      A:   Oh, no.

25                THE COURT:   How much total did you get from
```

1                          RETTIG (by Shroff)                44

2         your son?  Miss Shroff, let her answer.

3              THE WITNESS:  Okay, I know --

4              THE COURT:  If you don't remember, say you

5         don't remember.

6              THE WITNESS:  I don't really remember, no.

7              THE COURT:  Go ahead.

8              MR. RODRIGUEZ:  Your Honor, just one

9         question to follow up.

10  EXAMINATION BY MR. RODRIGUEZ:

11     Q:   The money that you received from your son that you

12  don't remember, was it more than the $35,000 --

13     A:   No.

14     Q:   -- that was referenced earlier?

15     A:   No, no, no.

16     Q:   Thank you.

17              THE COURT:  Okay, thank you, Miss Rettig, you can

18  go back into the audience.  Let me ask the Government,

19  what's the guidelines calculation for you on this?

20              MR. RODRIGUEZ:  Your Honor, back of the envelope,

21  depending on like a couple of enhancements and the loss

22  amount, my calculation is between 18 to 24, maybe 24 to 30

23  depending on the applicability of some enhancements --

24              THE COURT:  Without enhancements and with

25  exceptions, isn't it 18?

```
 1                        PROCEEDING                    45
 2            MR. RODRIGUEZ:   Yes.  Eighteen to 24 is my
 3   calculation.
 4            THE COURT:   How do we get to the 24?  I don't
 5   know, I used the loss amount under 1.5.
 6            MR. RODRIGUEZ:   As a range, the guidelines range.
 7            THE COURT:   Oh, I'm sorry.  Are you taking about
 8   months or you're talking about level?
 9            MR. RODRIGUEZ:   I was referring to months, I
10   apologize.
11            THE COURT:   Oh, I was talking about the level.
12            MR. RODRIGUEZ:   You were referring to levels,
13   yes.
14            THE COURT:   I put him at 18 which is higher.  You
15   have him at a lower level I guess.
16            MR. RODRIGUEZ:   Again, very back of the envelope.
17   I don't have my guidelines in front of me, but that's what I
18   have.
19            THE COURT:   Miss Shroff, what else?  Anything
20   else?  Don't repeat anything.
21            MS. SHROFF:   No, I just want to make sure if the
22   Court has questions about any of the money, I'm happy to
23   answer it because I do not think that that argument helps
24   the Government.  I firmly believe it helps Mr. De-Meyer.
25            THE COURT:   Which argument?
```

1                          PROCEEDING                    46

2              MS. SHROFF:   Any of the arguments that they

3    talked about about the money.  I just want to make sure if

4    you have questions about money, I'm able to answer them.

5              THE COURT:   Okay.

6              MS. SHROFF:   As of now, my estimate is he has

7    about $1,000 in his First Republic account.

8              THE COURT:   The defendant's money.

9              MS. SHROFF:   Right.  He has no ability right now

10   to do anything, not even hire a lawyer, and there's nothing

11   frozen.

12             THE COURT:   I guess the one thing that we haven't

13   figured out is the partner's money because that you told me

14   came - I now have to remember this - that there was money

15   deposited from the defendant into the partner's account, I'm

16   trying to remember what happened.

17             MR. RODRIGUEZ:   Sure.  So there's a JPM bank

18   account.  The defendant --

19             THE COURT:   That's right, money moved from his

20   JPM bank account into the partner's bank account.

21             MS. SHROFF:   No.

22             MR. RODRIGUEZ:   Let me try again.

23             THE COURT:   The former partner I should say.

24             MR. RODRIGUEZ:   Yes, Your Honor.  There's email

25   correspondence between the defendant and the wine seller in

1                          PROCEEDING                    47

2    North Carolina that the defendant sold the wine too, and he

3    instructed --

4              (interposing)

5              THE COURT:   That's right, the wine seller to pay

6    the boyfriend directly.

7              MR. RODRIGUEZ:   Yes, here's the account

8    information at the JPM --

9              THE COURT:   That's right.

10             MR. RODRIGUEZ:   -- account information --

11             THE COURT:   Okay --

12             MR. RODRIGUEZ:   -- for his former partner.

13             THE COURT:   And you have no – and you have bank

14   records of the defendant's partner's bank account?

15             MR. RODRIGUEZ:   Correct.

16             THE COURT:   And do you have records during the

17   period that the defendant's abroad?

18             MR. RODRIGUEZ:   For some of the period that he's

19   abroad.  I think most of it, in fact.  And based on our

20   review, there's no, I don't see any --

21             THE COURT:   Is the partner giving him money?

22             MR. RODRIGUEZ:   I see where the Court's going.

23   Not from what we can tell.  Not from what we can tell.  And

24   – yes.

25             THE COURT:   Okay, but he got a lot of money, and

1                              PROCEEDING                      48

2   I guess he's either kept it or who knows.

3              MR. RODRIGUEZ:   And the only other point that

4   I'll make about money, not to repeat myself, is this is the

5   money that's accounted for that shows up in bank accounts.

6   The Government's investigation shows that he's earned over a

7   million dollars mostly in cash transactions.  Not all of it

8   was deposited into the bank.  Where it is?  It could still

9   be at his disposal.

10             MS. SHROFF:   Your Honor, may I just add one fact?

11             THE COURT:   Go ahead.

12             MS. SHROFF:   So the Government knows this, right,

13  but the reason he comes back is because he's not able to

14  find a job.  He applies for a job in L.A., he's coming back

15  for a job interview.  A person who has --

16             THE COURT:   He had a job interview set up in

17  L.A.?  I don't think I heard that before.

18             MS. SHROFF:   That's right?

19             MR. DE-MEYER:   No, no interview.  I just had a

20  connection through my ex-boyfriend, and he has arranged for

21  some (inaudible).

22             (interposing)

23             MS. SHROFF:   So he --

24             THE COURT:   Well, it would be great to put your

25  client on the stand to find out why he came back.  We're

1
2  almost there.

3          MS. SHROFF:   Well, he came back to look for work.

4  I mean it's clear he comes back to look for work.   He

5  doesn't come back --

6          THE COURT:   Nothing's clear about the return --

7          MS. SHROFF:   Okay.  Well, he comes back to look

8  for work.  He contacts somebody in Los Angeles.  The Los

9  Angeles person says that he has connections to art galleries

10 where Mr. De-Meyer can try and get a job.  His friend offers

11 to be the go-between to help him get a job, and he comes

12 back.  And he contacts his mother to say I'm coming back,

13 and his mother contacts a lawyer to try and figure out if

14 anything can be worked out.

15         THE COURT:   Okay, I think I've had all my

16 questions answered.  Unless there's something you want to

17 add, Miss Shroff.

18         MS. SHROFF:   Well, the only last point I have is

19 that the fact that the boyfriend gets the money and the

20 boyfriend doesn't give the money to Mr. De-Meyer actually is

21 also a bad fact for the Government.  Maybe the boyfriend has

22 most of the money or maybe the boyfriend stole the wine.

23 I'm just saying you can't just seek to detain a person

24 because of one act they took, the act itself being totally

25 lawful.  The act is lawful.  His leaving is lawful.  You can

1                          PROCEEDING                     50

2      put whatever gloss you want on it, it was lawful, and they

3      made no effort to go get him back, and he's living in his

4      own name.

5                THE COURT:   Okay, thank you.

6                MS. SHROFF:   Thank you.

7                THE COURT:   All right, I'm smiling, Miss Shroff,

8      because – and you've done an excellent job – but – and I'm

9      going to set up conditions that I don't know if he'll meet,

10     but we'll see if he meets, for potential release.  But I

11     completely reject the notion that because an act is lawful

12     it doesn't reflect consciousness of guilt and does not

13     reflect a desire to flee and does not reflect a potential of

14     not returning to court.  So were there any review of this

15     record, I would not want anyone to think for a moment that I

16     accepted that argument.  I reject it completely.

17               On the other hand, what's mostly in this

18     defendant's favor is the fact that he returned at a time

19     when, I have no doubt, that he knew there was a potential

20     for his arrest or that this matter was still being

21     investigated and that he was at risk.  And he didn't do it

22     the way we would normally expect a rational person to do it,

23     which would be to arrange for his surrender.  If he had done

24     so, we probably wouldn't even be here.  He did it in such a

25     way that causes the Government and an objective person to

1

2  believe that he might have been simply taking a chance and

3  hoping that he could just live under the radar and might be

4  prepared to flee again in the future should circumstances

5  require it.  That's just one inference.  I don't know that

6  it's the most obvious inference, but I can't discount it.

7          On the other hand, as I say, it's a fact that

8  works in his favor and does something to counter the fact

9  that he left at a time that he knew he was potentially under

10 investigation.

11          Also in his favor is he's a United States citizen,

12 he has strong family connection here.  He has absolutely no

13 prior criminal history.  The guidelines sentence on this is

14 not terribly high.  If the defendant were to flee again, he

15 would be in so much more trouble than he would be with this

16 case.  You know, it goes to any - I mean either he would

17 have to live in exile the rest of his life or more likely he

18 would be extradited from whatever country he went to.  And

19 he would be charged in a separate charge with bail-jumping,

20 which would carry its own significant sentence in addition

21 to the sentence here which is not terribly significant from

22 the perspective of other cases that we see in this

23 courthouse.

24          On the other hand, this is not - I have to do this

25 in such a way that he has a strong incentive to stay here

PROCEEDING                    52

if, in fact, it is the case that he has access to cash or

other money as a result of the alleged crimes.  And the only

way I can do that is to have sureties that I suspect he

cares about and knowing that, if he did violate the

conditions of the release and failed to return to court,

would mean the absolute financial ruin of these individuals

because that's what it would mean.  If he fails to appear in

court, they get a judgment for the full amount of the bond,

it's going to be a very high amount, and they're going to

lose everything they have.

        So if there are four people, and I think I've

heard four names – the father, sister, nephew, and mother –

who are willing to put up their livelihoods to say, you

know, I believe that my relative is going to come back to

court and I'm staking my financial future on it, that in

combination with the security that I'm going to be imposing

would give me the assurance that we would return to court.

So I'll give you specifics in one moment.

        (pause in proceeding)

        THE COURT:   Okay, the conditions are as follows:

A $1 million personal recognizance bond to be cosigned by

four financially responsible persons secured by $200,000 in

cash and – cash or check, just so it's clear, wire transfer

– also, the mother's home.  Travel restricted to the

1

2  Southern and Eastern Districts of New York and the District

3  of Ohio.  Obviously, if he's required to appear in court,

4  he's permitted to fly to New York for that purpose.

5  Surrender of any travel documents, no new applications.

6  Strict Pretrial supervision, home detention with electronic

7  monitoring and GPS.  He should seek employment, I mean he's

8  not going to be barred from leaving during the day.  I'm

9  going to leave it to Pretrial Services to determine that.

10  He's not to possess a firearm, destructive device, or other

11  weapon, and he's to be detained until all conditions are

12  met.

13          Anything further from the Government?

14          MR. RODRIGUEZ:   Yes, Your Honor, just a point of

15  clarification.  I believe Your Honor said the Southern

16  District of New York, the Eastern District of New York, and

17  the District of Ohio.

18          THE COURT:   There's more than one district, isn't

19  there?

20          MR. RODRIGUEZ:   That was my, that's my belief,

21  yes.

22          THE COURT:   Where is this, do you know?

23          MR. RODRIGUEZ:   I believe Findlay is outside of -

24  -

25          THE COURT:   Northern, okay.  It's in the

PROCEEDING                          54

1  |

2  | Northern, Northern District of Ohio?

3  |          FEMALE VOICE:   Yes.

4  |          THE COURT:   I'll say Northern District of Ohio.

5  | If it turns out I got the wrong district, someone will tell

6  | me.  Any other issues?

7  |          MR. RODRIGUEZ:   I heard Your Honor ordered home

8  | detention.  Is the home detention ordered for his mother's

9  | residence in Ohio or is that --

10 |          THE COURT:   Yes, my assumption is he's going to

11 | live in the mother's home.

12 |          MR. RODRIGUEZ:   Yes, okay.  Just wanted to

13 | clarify.

14 |          THE COURT:   He's going to have to be supervised

15 | out of Ohio I guess.  And they have, if he meets the

16 | conditions, some system where he gets on a plane and they

17 | put the bracelet on when he gets there.  Miss Shroff, any

18 | questions?

19 |          MS. SHROFF:   No, thank you.

20 |          THE COURT:   Okay, thank you, everyone.

21 |          MR. RODRIGUEZ:   Your Honor, I just have one

22 | application, I apologize.

23 |          THE COURT:   Go ahead.

24 |          MR. RODRIGUEZ:   The Government has a speedy trial

25 | application.  We produced discovery today.  We would move to

```
 1                          PROCEEDING                        55

 2  exclude time under the speedy trial --

 3          THE COURT:   I don't think that's been referred.

 4          MR. RODRIGUEZ:   Very good.

 5          THE COURT:   Thank you, everyone.

 6          (Whereupon the matter is adjourned.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

## C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, United States of

America versus Nicholas De-Meyer, Docket #17cr595, was

prepared using PC-based transcription software and is a true

and accurate record of the proceedings.

Signature_____

Date:  March 9, 2018